CANNON *v.* STATE

No. 42092·        May 21, 1962        141 So. 2d 251

*Lumpkin, Holland* and *Ray,* Tupelo; *Robert B. Smith,* Ripley, for appellant.

200

*G. Garland Lyell, Jr.,* Asst. Atty. Gen., Jackson, for appellee.

RODGERS, J.

■ ■ Appellant was indicted for murder, convicted of manslaughter and sentenced to a term of eight years

in the State Penitentiary. The chain of events leading up to the fatal shooting began about 8:15 o'clock on Saturday night, February 25, 1961, when deceased, Kelly Eugene Belk, a twenty-nine year old white male, was seen going toward police headquarters in an automobile at an unusually fast rate of speed. He was a well-known, popular citizen of Tupelo, Mississippi, and known as "Gene" Belk. When he arrived at police headquarters, he got out of his automobile and as he approached the front door, he met Charles Dunlap who was waiting to see an attorney. Mr. Dunlap asked Mr. Belk if he were "Billy Shelton", an attorney, and he replied in the affirmative. Mr. Dunlap followed Mr. Belk into the waiting room of the police headquarters. Gene Belk continued through the waiting room and entered the room where radio equipment used by police was kept, and where appellant was sitting at a desk using the telephone. Mr. Dunlap did not enter the radio room. He could see through the glass partition and could also hear what was being said by the parties. Gene Belk made a dying declaration as to what transpired, and there is a conflict as to his being shot in the back and the testimony of defendant Cannon. It appears the dying declaration and all testimony is in accord on the following facts: The deceased was drinking. He was armed with a .25 caliber Beretta automatic pistol. When he saw appellant sitting at the desk, it "made him mad." Appellant was on duty as a policeman. He had a .38 caliber pistol in a drawer of his desk where he was sitting. Gene Belk put his hand in his pocket, and James Cannon, the policeman, fired three times. There were four wounds in Gene Belk's body made by two bullets, one striking his arm and one his left side above the hip.

After the shooting, Belk walked out of the radio room into the waiting room, stopped, looked at Mr. Dunlap, and without speaking left by a side door leading into

an alley. Firemen in a nearby station heard a metallic sound strike the roof of the building which they occupied, and found a .25 Beretta automatic pistol on the roof, which was later identified as a pistol belonging to deceased. Officers followed a trail of blood from the police station and found a loaded pistol clip. The dying declaration of deceased made at the community hospital is conflicting in that he said at one time he did not want to kill Cannon but wanted to "beat hell out of him" and he went to the station to "rough up" Cannon. At another time, he said he went to the station to get in touch with a highway patrolman. His declaration, however, admitted that he was angry, drinking, and had words with appellant, that he put his hands in his pocket but did not show his gun. He stated that Cannon shot him in the back when he started to leave.

The testimony of appellant and that of the only eyewitness, Charles Dunlap, is to the effect that Gene Belk entered the radio room where Cannon was on duty and continued to walk toward him until he was in close proximity and said "I am going to kill you", to which the officer replied "Go on, I don't want to hurt you." The deceased replied "You son of a bitch, I am going to kill you", and put his left hand in his front pocket. Appellant fired three times, striking Gene Bulk twice, once in his right arm and once on the back of the left side. He died the following Friday. The jury found defendant guilty of manslaughter and begged the mercy of the court.

The verdict of the jury was based upon two statements of Kelly Eugene Belk, admitted in evidence as dying declarations. The first statement was made the night he was brought to the hospital, a short time after he had been shot. This statement was made nearly seven days before his death. The second statement was made the day before his death. It was attempted to be shown, by the testimony of a pathologist who per-

formed an autopsy, that the deceased was shot in the back, but this testimony is not clear and is refuted by the testimony of a nurse who bandaged the wound on Mr. Belk's side while he was lying on his back. An effort was made by the State to discount the testimony of Charles Dunlap, the only eye-witness, by recalling him after the defendant had closed his case so as to introduce a witness who testified that he would not believe the testimony of this eye-witness on oath.

Testimony introduced for the State in this case is weak, and testimony showing defendant acted in self-defense is clear and strong. Assuming that the statement made seven days before the death of Gene Belk is admissible as a dying declaration, the only material difference between the dying declarations and the testimony of defendant and Dunlap is the statement by Gene Belk that he was shot in the back after he had turned to leave the police radio room. This statement, if true, would indicate that defendant was then attempting to take his life without justification, and that he could reasonably apprehend that his assailant would continue his assault until his unlawful purpose had been achieved. The undisputed facts show the contrary, that deceased did not believe he had anything to fear after he quit "having words" with defendant and left his presence, because he went outside of the police station and threw his pistol on top of the fire station.

Appellant filed a motion for a new trial on the ground "That the verdict of the jury is against the overwhelming weight of the evidence." It is apparent to this Court that the learned trial judge should have sustained the motion for several reasons hereinafter set out, for, in our opinion, his conviction was against the great weight of the evidence.

In the case of Conway v. State, 177 Miss. 461, 171 So. 16, this Court said: "Here we have a case where all the eyewitnesses * * * made out a case of self-

defense, and the state relied for conviction on the dying declarations alone. Such declarations are a species of hearsay evidence which are admitted for reasons of public necessity * * * However, such declarations should be admitted with caution and weighed by the jury with the greatest deliberation. In the nature of things they carry elements of weakness, the memory of declarant may be impaired by his wounds, or it may be impaired by the excitement and confusion of the difficulty; there is a possibility of the declarant mistaking inferences from facts.''

This Court pointed out in the Conway case, supra, that ''This is not a case for a directed verdict of not guilty, but it is a case where we think the jury went against the preponderance of the evidence.'' We are therefore of the opinion that the testimony in this case is such that the trial court should have granted a new trial upon the testimony alone.

▆▆ ▆ No motion was made for a change of venue, and although the trial judge summoned one hundred and twenty-five special veniremen, it is apparent from the record that the popularity and influence of a brother of deceased, Leroy Belk, reached even into the jury box. Time and again during the qualification of the veniremen, prospective jurors admitted that they could not give defendant a fair trial, or doubted that they could give defendant a fair trial, because of their friendship for Leroy Belk, County Superintendent of Education. The record also shows that the audience indicated its animosity toward defendant to such an extent that counsel felt constrained to request of the court proper docorum. The trial judge very properly warned the audience at a time when the jury was out of the courtroom, but it is obvious to this Court that popularity of the County Superintendent of Education enhanced the value of the testimony as to what his brother told him in his dying declaration.

Defendant, finding himself in this situation, and under this state of the proceedings, sought the following instruction: "The court instructs the jury for the defendant that the dying declarations of the deceased Kelly Gene Belk are not entitled to the same credit and force as if the deceased were alive and testifying in the presence of the jury, under oath; that is a species of hearsay evidence and is intrinsically weaker than if the declarant were present and subject to cross-examination; and the jury alone are the judges of its weight and force." The instruction was refused and we think this reversible error under the facts in this case. See Lipscomb v. State, 75 Miss. 559, 23 So. 210; Muse v. State, 158 Miss. 449, 130 So. 693.

We do not find that it is necessary to pass upon the question as to whether or not the fact that the juror C. G. Henderson was a resident of another county violated the constitutional right of the defendant to be tried by an impartial jury of the county where the offense was committed, because it is assumed that upon a retrial, the State will be zealous in requiring all persons serving on the jury to be qualified.

We are therefore of the opinion that the judgment and sentence of the lower court should be set aside, and this case is reversed and remanded for a new trial.

Reversed and remanded.

*McGehee, C. J.,* and *Kyle, Arrington* and *Ethridge, JJ.,* concur.